IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUXCLUB, INC. | **Complaint for a Civil Case** |
| Plaintiff, | Case No. 2018-cv- |
| -against- | Jury Trial Demanded |
| DGL GROUP LTD.;<br>EZRA ZAAFARANI;<br>MARK NAKASH;<br>SOLOMON KOHL;<br>VICTOR SARDAR; and<br>ELIE WAHBA.<br><br>Defendants. | |

## COMPLAINT

COMES NOW Plaintiff LuxClub, Inc. (hereinafter, "LuxClub"), by and through its attorneys, Rosenbaum Famularo, P.C. and ATLaw*ip* LLC, for its Complaint against Defendants DGL Group Ltd. (hereinafter, "Distributor"), Ezra Zaafarani, Mark Nakash, Solomon Kohl, Victor Sardar, and Elie Wahba (collectively with "Distributor," "Defendants"), alleges and shows this Honorable Court as follows:

### I. INTRODUCTION

This lawsuit centers around a company knowingly committing fraud and padding their profit margin by selling counterfeit goods resulting in significant detriment to its victims who resold the counterfeit goods on the Amazon.com

1

selling platform.  Specifically, Defendants were actively engaged in manufacturing, distributing, selling, promoting, or attempting to pass off counterfeit wireless charging pads as authentic Samsung products.

More specifically, Plaintiff LuxClub entered into agreements with Defendants to purchase authentic Samsung electronic goods from Defendants over the course of several months.  One type of these electronic goods included Samsung wireless chargers for cell phones ("Samsung Chargers").  LuxClub purchased significant amounts of these Samsung Chargers from Defendants.

Rather than providing authentic Samsung Chargers as agreed, Defendants sold and delivered counterfeit products that were inferior, low-quality masquerades of authentic Samsung Chargers.  Defendants took this course of conduct in breach of agreement with, and without any knowledge or consent by, Plaintiff LuxClub.

LuxClub then sent all of the Samsung Chargers to Amazon's warehouse system for sale to third-party buyers.  Consequently, buyers that purchased from LuxClub actually received counterfeit Samsung wireless chargers.

One of those buyers was the products manufacturer Samsung who determined that LuxClub's Samsung Chargers were counterfeit.  As a result, Samsung filed a formal complaint with Amazon, which resulted in LuxClub's suspension from selling on the Amazon e-commerce sales platform.  In fact, until

recently, LuxClub was still suspended from selling due to its sales of counterfeit Samsung Chargers purchased from Defendants.

LuxClub seeks damages and injunctive relief to prevent Defendant from further sale of counterfeit goods.

## II. THE PARTIES

1. Plaintiff LuxClub, Inc. is a domestic corporation organized and existing under the laws of New York with its principal place of business at 1839 East 13th St., Brooklyn, New York 11229. LuxClub purchases goods from wholesalers and distributors, sends them to Amazon's warehouses, and then resells them to third-party buyers through the Amazon.com platform.

2. Upon information and belief, Defendant DGL Group Ltd. is a New York business corporation organized and existing under the laws of New York. Upon further information and belief, Defendant DGL Group Ltd.'s principal place of business is located at 33 34th Street, 5th Floor, Brooklyn, New York 11232. Defendant DGL Group Ltd. may be served through its registered agent for service of process, Ezra Zaafarani, 195 Raritan Center Parkway, Edison, New Jersey 08837.

3. Upon information and belief, Defendant Ezra Zaafarani (hereinafter, "Zaafarani") is a New York resident. Upon further information and belief, Defendant Zaafarani is the Chief Executive Officer of Defendant DGL Group Ltd.

Upon further information and belief, Defendant Zaafarani also serves as the chairman of the board for Defendant DGL Group Ltd.

4.   Upon information and belief, Defendant Mark Nakash (hereinafter, "Nakash") is a New York resident.  Upon further information and belief, Defendant Nakash is the Vice President of Defendant DGL Group Ltd.

5.   Upon information and belief, Defendant Solomon Kohl (hereinafter, "Kohl") is a New York resident.  Upon further information and belief, Defendant Kohl is the Accountant for Defendant DGL Group Ltd.

6.   Upon information and belief, Defendant Victor Sardar (hereinafter, "Sardar") is a New York resident.  Upon further information and belief, Defendant Sardar is a Partner of Defendant DGL Group Ltd.

7.   Upon information and belief, Defendant Elie Wahba (hereinafter, "Wahba") is a New York resident.  Upon further information and belief, Defendant Wahba is the Sales representative for Defendant DGL Group Ltd.

8.   Upon information and belief, Distributor offers for sale and sells *inter alia* consumer electronic equipment.  Upon further information and belief, Defendants Zaafarani, Nakash, Kohl, Sardar, and Wahba were responsible for all aspects of Distributor.

### III. JURISDICTION AND VENUE

9.   This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1331, in that it involves claims arising under the laws of the United States and specifically involves violations of 18 U.S.C. § 1964 (Civil RICO) with predicate acts of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1962 (Conspiracy). This Court also has jurisdiction pursuant to 28 U.S.C. § 1338(a).

10.  The Court has personal jurisdiction over each of the Defendants pursuant to FED. R. CIV. P. 4(k) and/or N.Y.C.P.L.R. §§ 301 and 302.  On information and belief, each of the Defendants (a) is present in New York; (b) engaged (either directly or through an agent) in business transactions in New York that are at issue in this action; (c) contracted (either directly or through an agent) outside of New York to supply the counterfeit goods at issue within the state of New York, and/or (d) committed tortious acts (either directly or through an agent) outside of New York that caused injury to person or property within New York, expected or should reasonably have expected those acts to have consequences within New York, and derives substantial revenue from interstate or international commerce.

11.  This Court has supplemental jurisdiction over LuxClub's New York state-law claims pursuant to 28 U.S.C. § 1367, in that the state law claims are integrally-related to the federal claims and arise from a common nucleus of operative facts, such that the resolution of all claims herein is in the interests of judicial economy.

12. This Court has personal jurisdiction over Defendant Distributor because it is incorporated in the State of New York.

13. Upon information and belief, this Court has personal jurisdiction over Defendant Zaafarani because he is a resident of the State of New York.

14. Upon information and belief, this Court has personal jurisdiction over Defendant Nakash because he is a resident of the State of New York.

15. Upon information and belief, this Court has personal jurisdiction over Defendant Kohl because he is a resident of the State of New York.

16. Upon information and belief, this Court has personal jurisdiction over Defendant Sardar because he is a resident of the State of New York.

17. Upon information and belief, this Court has personal jurisdiction over Defendant Wahba because he is a resident of the State of New York.

18. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391.

## IV. PLAINTIFF LUXCLUB

19. LuxClub owns and operates IncaDove Amazon storefront. A description of Amazon storefronts is presented in Section VIII, below.

20. In October 2013, Margaret Mosseri started LuxClub primarily dealing in the sale of handbags, watches, and other accessories. Mrs. Mosseri sourced her goods by purchasing from US based outlet stores, such as Michael Kors, and then reselling the goods online. Not long after, in July 2014, Abraham Mosseri stepped

down from a high-paying position with another company to join LuxClub. With Mr. Mosseri's background in electronics, LuxClub changed its focus to selling consumer electronics and began adding many new products acquired through distributors. As a result, LuxClub benefitted from rapid growth in sales and revenue buttressed by overwhelmingly positive customer feedback. By April 2015, Michael Masri joined the LuxClub team as a buyer and operations manager. Since then, LuxClub enjoyed steady growth in revenue until the events which precipitated this complaint.

## V. DEFENDANTS' OPERATIONS

21.  Upon information and belief, Defendants own and operate stores that sell electronic consumer goods.  Additionally, upon further information and belief, Defendants offer for sale and sell goods wholesale to resellers.

22.  After Amazon suspended LuxClub, LuxClub conducted research which revealed that Defendants have a history of selling defective goods. The two below links clearly demonstrate DGL's penchant for selling low-quality goods and providing poor customer support to entities such as Mobile Star.

https://www.bbb.org/new-jersey/business-reviews/electronic-equipment-and-supplies-wholesale-and-manufacturers/dgl-group-in-edison-nj-90137947/reviews-and-complaints (last visited October 18, 2017);

http://www.ripoffreport.com/reports/relevant/dgl-usa (last visited October 18,

2017).

## VI. PLAINTIFF LUXCLUB PURCHASES SAMSUNG ELECTRONIC GOODS FROM DEFENDANTS

### A. Presales Events

23. Defendant Wahba used to work as a sales representative for a company that conducted business with LuxClub in Florida. Wahba moved to New York and started working for Defendants. While working for Defendants, Wahba contacted LuxClub seeking to establish a new business relationship between LuxClub and his new employer, DGL. Wahba immediately began to offer "authentic" Samsung products for sale to LuxClub.

24. Subsequently, LuxClub made several purchases from Defendants. Defendants used the Internet to operate Distributor's website. http://www.dglusa.com/ (last visited October 18, 2017).

25. Early in the business relationship, LuxClub would pay for the goods at the time of placing the order but, due to significant delays between order and shipment, LuxClub eventually started paying for goods a day or so prior to the actual delivery date. For the most part, LuxClub used a credit card for all transactions for which it paid an additional 2.25% processing fee.

26. Typically, to place an order, LuxClub would either speak to Wahba on the phone about an order, send Wahba an email regarding an order, or send Wahba a purchase order ("Purchase Orders"). LuxClub would request an item and then

8

specify the quantity needed. Sometimes these items needed to be imported or shipped, so LuxClub would take goods as they came in. As noted above, Distributor had a tendency for delayed or outstanding shipments, therefore, LuxClub preferred not to place orders with Purchase Orders. Instead, LuxClub began providing verbal or email commitments to purchase goods and only made purchase orders once the orders arrived.

27. LuxClub dealt primarily with Wahba who was sometimes accompanied by other company personnel. Wahba served as the salesperson, the delivery driver, and the customer service representative. For all other interactions including, without limitation, refunds or complaint escalations and resolutions, LuxClub dealt with either Sardar or Nakash.

28. Defendants always delivered shipments in either a van or a car. Deliveries were seldom organized as Wahba would often forget to bring along the appropriate delivery documents. As a result, LuxClub had no choice but to always inventory each shipment because Distributor would often commit delivery errors. Delivery errors usually consisted of orders missing items, orders with an incorrect number of items, orders containing the wrong items, or orders with damaged items or damaged packaging.

29. Any errors or issues with goods were generally reported to Wahba. Purportedly unable to resolve the problems or issue refunds himself, Wahba

would simply take back the merchandise. In order to process the refund or address shipments that were short units or shipments that arrived in damaged packaging, LuxClub would have to attempt to contact Sardar or Nakash which was always a challenge; neither Sardar nor Nakash was readily available.

30.  LuxClub had contact with Nakash via email concerning all returns and all orders with missing items. Specifically, LuxClub dealt with Nakash regarding the wireless charging pads.

31.  Upon information and belief, LuxClub spoke with Kohl on the telephone concerning an accounting issue. Upon further information and belief, Kohl was sometimes the delivery driver accompanying Wahba.

32.  LuxClub's purchases from Distributor between September 3, 2015 to September 28, 2016 were made pursuant to Distributor's standard form Purchase Order.  The terms of the Purchase Orders include representations by Distributor that it did not sell counterfeit goods.

33.  Distributor communicated with LuxClub via email.  *See, e.g.,* Declaration of Mr. Abraham Mosseri ("Mosseri Decl."), ¶ 4, Exhibit 2 (2015.10.1 - E-mail to DGL (email string from Abraham Mosseri, LuxClub, to Elie Wahba, DGL Group Ltd.); *see also* Mosseri Decl. ¶ 5, Exhibit 5 (2015.10.16 - Initial Offering from DGL); Mosseri Decl. ¶ 5, Exhibit 9 (2015.11.25 - E-mail Accompanying Invoice 153445); Mosseri Decl. ¶ 5, Exhibit 12 (2015.11.30 - E-mail Accompanying Invoice 153531

& 153494).

34. LuxClub conveyed purchasing information via email.

35. Distributors sent Purchase Order invoices to LuxClub via email.

**B. Defendants' Counterfeit Samsung Goods**

36. LuxClub made purchases for two different Samsung Chargers from Defendants.

37. The first Samsung Chargers had a Distributor Stock Keeping Unit (SKU) of SAM-EP-PG920IBKG. The name of the product is Samsung EP-PG920I Wireless Charger Pad for Samsung Galaxy S6 – Black ("Black Samsung Wireless Charger").

38. Images of an authentic Black Samsung Chargers include the following images from http://www.samsung.com/us/mobile/mobile-accessories/phones/wireless-charging-pad-black-sapphire-ep-pg920ibugus/ (last visited October 18, 2017):



39.  The second Samsung Chargers had a Distributor SKU of SAM-EP-PG920IWEGWW.  The name of the product is Samsung EP-PG920I Wireless Charger Pad for Samsung Galaxy S6 – White ("White Samsung Wireless Charger")(collectively with Black Samsung Wireless Charger, "Samsung Chargers").

40.  Images of an authentic White Samsung Wireless Charger include the following images from http://www.samsung.com/us/mobile/mobile-accessories/phones/wireless-charging-pad-white-pearl-ep-pg920iwugus/ (last

12

visited October 18, 2017):



41. The Samsung Chargers have the same description –

    With this stylish accessory, available in black sapphire or white, you can charge your compatible Galaxy smartphones and other Qi-compatible devices without the need to plug your device in to a wall charger or USB port. Simply place your device directly onto the charging pad and your phone begins to charge.

http://www.samsung.com/us/mobile/mobile-accessories/phones/wireless-charging-pad-white-pearl-ep-pg920iwugus/ (last visited Jul. 5, 2017).

42. LuxClub purchased hundreds of Samsung Chargers from September to

November 2015.  *See, e.g.*, Mosseri Decl. ¶ 5, Exhibit 1 (2015.9.18 - Invoice 152870); *see also* Mosseri Decl. ¶ 5, Exhibit 3 (2015.10.12 - Invoice 152975); Mosseri Decl. ¶ 5, Exhibit 4 (2015.10.14 - Invoice 153000); Mosseri Decl. ¶ 5, Exhibit 6 (2015.11.18 - Invoice 425901); Mosseri Decl. ¶ 5, Exhibit 7 (2015.11.19 - Invoice 425992); 2015.11.23 - Invoice 153445; Mosseri Decl. ¶ 5, Exhibit 10 (2015.11.25 - Invoice – 153494); Mosseri Decl. ¶ 5, Exhibit 11 (2015.11.30 - Invoice 153531).

43.  LuxClub paid a reasonable price per unit for the Samsung Chargers. Despite paying a reasonable amount for the Samsung Chargers, Defendants defrauded LuxClub out of money by delivering counterfeit Samsung Chargers.

44.  Defendants represented that they were authentic Samsung Chargers.

45.  On several occasions, Defendants' implied that they were selling genuine Samsung Chargers by verbally stating the items they sold were "authentic" or by including the word "Samsung" on offers.  Though Defendants never used the word "Samsung" on any of its invoices, early emails between the Defendants and LuxClub did contain the name "Samsung'" in later emails, Defendants switched to using some form of short-hand notation instead. For example, rather than writing "Samsung Wireless Charging Pad" Defendants would simply write "Wireless Pad" or "Pad." Additionally, sometimes Defendants would refer to an item by its model number or the unique part of its model number such as "TA20" to stand in for "Samsung EP-TA20JWE." However, when speaking in

person or on the telephone, Defendants often resorted to using the name
"Samsung." During multiple conversations regarding Samsung purchases,
Wahba did in fact refer to the chargers as "Samsung" chargers. Furthermore,
Wahba routinely asked if LuxClub needed anymore "Samsung." When LuxClub
began receiving customer complaints, Wahba reassured LuxClub that everything
was 100% authentic. Moreover, after Amazon suspended LuxClub's account,
Sardar, in an email reply to LuxClub, stated that everything was authentic.

46. Defendants' invoice demonstrated that the sale was for authentic Samsung
Chargers. Additionally, Defendants charged LuxClub fair market price for the
wireless chargers.

47. LuxClub did not receive authentic Samsung Chargers that they paid for
from Defendants.

### C. Post-Sale Events

48. LuxClub questioned Distributor about issues that arose with
Amazon/Samsung. LuxClub requested a letter of authenticity from Distributor
concerning the counterfeit Samsung Chargers, and Defendants refused to
provide such a letter.

49. LuxClub supplied invoices to Amazon from Distributor which were
denied. It was not until Amazon denied invoices that LuxClub realized
Distributor never wrote the word "Samsung" on any of its invoices and that

every line of each invoice just used a SKU that resembled or matched a Samsung part number. In order to refute Amazon's claims, LuxClub requested a letter of authenticity from Distributor that stated that Distributor sold Samsung goods and also provided a key matching each SKU to its corresponding Samsung part. Distributor refused to provide such a letter or to assist LuxClub with its appeal to Amazon.

50.   Furthermore, after refusing to provide a letter, Sardar sent an email to LuxClub stating, "[A]s you know we are NOT authorized distributors and you knew the goods are authentic but gray market."

51.   Distributor refused to write that it sold LuxClub any Samsung Chargers. Distributor insisted that everything was 100% authentic, but refused to put into writing that it sold Samsung Chargers to LuxClub.

52.   LuxClub purchased the Samsung Chargers with the understanding that they were all authentic Samsung products.

53.   LuxClub believed the products were authentic because LuxClub was paying a fair market price for the goods from a major US company that sold to other companies such as Walmart. LuxClub went so far as to visit DGL's offices in New Jersey to verify it was a legitimate business capable of providing the required products.

**VII. CONSPIRACY**

54.  Upon information and belief, Distributor's Chief Executive Officer, Defendant Zaafarani, managed all aspects of Distributor.  Upon further information and belief, Defendant Zaafarani made or was involved in every major decision of Distributor.

55.  Upon information and belief, Distributor's Vice President, Defendant Nakash, managed all aspects of Distributor.  Upon further information and belief, Defendant Nakash made or was involved in every major decision of Distributor.

56.  Upon information and belief, Defendant Zaafarani made an agreement with Defendant Nakash to sell counterfeit Samsung Chargers.

57.  Upon information and belief, Defendant Zaafarani directed one or more employees of Distributor to procure, manufacture, or sell counterfeit Samsung Chargers.

58.  Upon information and belief, Defendant Nakash directed one or more employees of Distributor to procure, manufacture, or sell counterfeit Samsung Chargers.

59.  Upon information and belief, Defendants succeeded in procuring, manufacturing, or selling counterfeit Samsung Chargers on divers occasions.

60.  Upon information and belief, Defendants sold counterfeit Samsung Chargers to other purchasers besides LuxClub.

17

## VIII. AMAZON.COM

61. Amazon.com Inc. is the world's largest online retailer.  The Amazon.com platform offers products worldwide.  Amazon is available solely online at https://www.amazon.com/ (last visited October 18, 2017).

62. "Amazon provides a platform for third-party sellers ("Sellers") and buyers ("Buyers") to negotiate and complete transactions. Amazon is not involved in the actual transaction between Sellers and Buyers . . . ." https://www.amazon.com/gp/help/customer/display.html?nodeId=1161302 (last visited Nov. 23, 2016).

63. Sellers ship goods to various Amazon warehouses across the United States.  At those warehouses, Amazon stores a seller's inventory and ships goods out of those warehouses.

### A. Purchasing on Amazon

64. To make a purchase, typically, a Buyer searches for a particular item on Amazon.com or via a mobile application and submits an order.

65. Amazon identifies that particular item at one of its many warehouses. Amazon then fulfills that order by mailing the items to the Buyer.

### B. Selling on Amazon

66. Amazon.com Inc. allows Sellers to offer for sale and sell products on the Amazon.com platform.  Amazon.com, Inc. requires that Sellers enter into

agreements with it concerning the relationship between it and Sellers, duties and responsibilities of the Sellers, and other policies. *See, e.g.*, Amazon.com's Participation Agreement *available at* https://www.amazon.com/gp/help/ customer/display.html?ie=UTF8&nodeId=1161302 (last visited Jul. 5, 2017); *see also* Amazon.com's Changes to the Participation Agreement *available at* https://www.amazon.com/gp/help/customer/display.html/ref=hp_rel_topic? ie=UTF8&nodeId=537792 (last visited Jul. 5, 2017); Amazon.com's Restricted Products *available at* https://www.amazon.com/gp/help/customer/display. html?nodeId=200277040 (last visited October 18, 2017).

67.  To sell on Amazon.com, a Seller begins with a set of quick start instructions.  *See* Amazon.com Quick Start *available at* https://www.amazon.com/gp/help/customer/display.html?nodeId=1161234 (last visited Jul. 5, 2017).

68.  Amazon.com's Quick Start includes the following steps:

**1**  **List your items for sale**
Search for the item on Amazon.com and click the **Sell Yours Here** button. Make sure you have the correct product; one title can have several editions or formats.
*Search now!*
*Learn more about fees and pricing.*

**2**  **Get orders**
Amazon sends you an e-mail notification when an item sells and posts the order in your seller account. In case you don't get the e-mail (or it is filtered as spam), make sure to check for

orders in your seller account regularly.
*How to check orders.*

 **Ship items to your buyers**
Get the shipping information from the order details in your seller account. Print the packing slip and address label and then purchase postage to mail your item within 2 days of the order date. Return to your seller account to confirm shipment.
*How to ship.*
*How to confirm shipment.*

**Get paid**
Once you have confirmed shipment, Amazon Payments charges the buyer's credit card and, after deducting fees, credits funds to your Payments account. If your bank account information has been on file for at least 14 days, Amazon Payments then transfers money directly into your bank account.
*Learn more about getting paid.*

As part of this process, individuals or businesses must register with Amazon, and create a name for their Amazon Store or storefront.  Each seller registering on Amazon selects their own name for their Amazon Store or storefront.

69. Amazon.com Inc. allows Sellers to sell generic items under the same Amazon Standard Identification Number ("ASIN").[1]  The only factor that

---

[1]     Amazon Standard Identification Numbers (ASINs) are unique blocks of 10 letters and/or numbers that identify items.  You can find the ASIN on the item's product information page at Amazon.com.  For books, the ASIN is the same as the ISBN number, but for all other products a new ASIN is created when the item is uploaded to our catalogue.  You will find an item's ASIN on the product detail page alongside further details relating

separates Sellers of products on the same ASIN is the Sellers' goodwill. Since goodwill is the life blood of any Amazon seller, the Seller's success or demise can be made or broken by reviews from Amazon purchasers.

70. Negative reviews damage a Seller's brand name and kill sales because purchasing decisions are largely made after reading reviews left by others.

### C. Intellectual Property Issues on Amazon

71. Amazon.com Inc. takes intellectual property infringement cases seriously. As such, it automatically suspends a Seller's offering if a complaint is filed. Amazon does not review all of its automatic suspensions nor does it intervene in alleged disputes between a Seller and a complainant.

72. Rather, an accused Seller must resolve any apparent issue with the complainant. However, complainants often fail to respond to good faith efforts to resolve issues. Or, complainants often ignore evidence and arguments that

———————————————

to the item, which may include information such as size, number of pages (if it's a book) or number of discs (if it's a CD).
ASINs can be used to search for items in our catalogue. If you know the ASIN or ISBN of the item you are looking for, simply type it into the search box (which can be found near the top of most pages), hit the "Go" button and, if the item is listed in our catalogue, it will appear in your search results.

http://www.amazon.com/gp/seller/asin-upc-isbn-info.html  (last visited Jul. 5, 2017).

prove their complaint lacks merit.  In either situation, an accused Seller is left in limbo.  Hence, accused Seller are left with two options – 1) remain suspended, or 2) seek judicial intervention.

73.  In some cases, Amazon not only suspends an accused offering, it also suspends an accused Seller's entire account regardless of whether the intellectual property complaint applies to the other offerings.

74.  The devastating effects of a wrongful intellectual property complaint on the Amazon.com platform can be more clearly seen when compared to a brick and mortar store, such as Wal-Mart.

75.  If an Amazon complainant submits a single-paged intellectual property infringement report, the result is similar to Wal-Mart removing a certain product from all of its shelves instantly from all of its stores worldwide.

76.  Often, Amazon may suspend all of an accused Seller's offerings.  This is akin to Samsung having an intellectual property complaint against one model of one television, then Wal-Mart removes all of Samsung's televisions, stereos, speakers, computers, monitors, printers, cameras, washers, dryers, refrigerators, ovens, dishwashers, microwaves, vacuums, cell phones, tablets, virtual reality devices, wearable smart devices, smart home devices, portable music players,

and headphones.[2]

77.  For Samsung, the suspension would only apply at Wal-Mart.  However, for many Amazon Sellers, the Amazon.com platform is the only avenue they sell through.

### D. Filing an Infringement Complaint with Amazon

78.  The online complaint process at Amazon.com is streamlined and straightforward.  https://www.amazon.com/gp/help/reports/infringement (last visited October 18, 2017).

79.  Amazon.com, Inc. requires the rights owner to withdraw a complaint. That is, a rights owner must send an e-mail from the complainant's e-mail address requesting to withdraw a complaint.  Mosseri Decl. ¶ 6.  Often, should an accused seller provide original invoices, the rights owner will withdraw a complaint.  Mosseri Decl. ¶ 7.

80.  Should a rights owner refuse to withdraw a complaint, the Amazon.com seller's ASIN is locked so a seller cannot sell goods associated with that ASIN. Mosseri Decl. ¶ 8.

---

[2] http://www.samsung.com/us/aboutsamsung/#  (last visited October 18, 2017).

81. Further, complaints may lead to account suspension.  Mosseri Decl. ¶ 9.

82. An account suspension is where Amazon locks a seller's account so that it cannot sell any item, even those unrelated to the ASIN complained of.  Mosseri Decl. ¶ 10.

## IX. SAMSUNG FILES A COUNTERFEIT GOODS COMPLAINT WITH AMAZON AGAINST LUXCLUB'S INCADOVE AMAZON STOREFRONT

### A. Samsung Electronics Co., Ltd.

83. From Samsung's website, Samsung Electronics Co., Ltd. describes itself as the following:

> For over 70 years, Samsung has been dedicated to making a better world through diverse businesses that today span advanced technology, semiconductors, skyscraper and plant construction, petrochemicals, fashion, medicine, finance, hotels, and more. Our flagship company, Samsung Electronics, leads the global market in high-tech electronics manufacturing and digital media.
>
> Through innovative, reliable products and services, talented people, a responsible approach to business and global citizenship, and collaboration with our partners and customers, Samsung is taking the world in imaginative new directions.

http://www.samsung.com/us/aboutsamsung/ (last visited October 18, 2017).

84. In association with those sales, Samsung owns various forms of intellectual property.  Relevant to this lawsuit, Samsung owns trademarks to its name and logos.  In fact, Samsung either has applied for or owns a federal registration to the word Samsung in 28 different applications.



85. For example, the word Samsung was registered on the Principal Register

of the United States Patent and Trademark Office on September 9, 2004 as U.S.

Registration No. 2,882,774; true and correct copies of the registration is attached

hereto as Exhibit 13.

**B. Samsung Investigates Offers for Sale and Sales of Counterfeit Wireless Chargers**

86.  Upon information and belief, Samsung conducted a private investigation into sales of counterfeit Samsung Chargers sold on Amazon.com.

87.  Samsung purchased a Charger from LuxClub's Amazon storefront IncaDove.  The purchase was made on or around December 2015.

88.  On November 16, 2016, LuxClub, through their Amazon storefront IncaDove, received a notice of infringement concerning its Samsung phone charger offerings on Amazon.com.

**C. SAMSUNG'S DISCOVERY OF COUNTERFEIT CHARGERS**

89.  Upon information and belief, Defendants, or business entities that they have sold to, have been sued for selling other counterfeit, inauthentic, or defective goods to other resellers.  Upon further information and belief, federal investigators have seized goods from Defendants.  See paragraph 22, above.

90.  Upon information and belief, Defendant Wahba is related to the owner of the company Mobile Star. Upon further information and belief, Defendant Wahba stated, prior to joining DGL, that he was taking a job with another company from which his brother's company, Mobile Star, purchased all of its merchandise. Mobile Star is the defendant in numerous lawsuits alleging the sale of counterfeit goods, including a suit brought by Apple for the distribution of

counterfeit iPhone devices, Apple power products, and charging cables on Amazon. https://www.bizjournals.com/sanjose/news/2016/10/20/ninety-percent-of-genuine-apple-chargers-on-amazon.html (last visited October 18, 2017), http://www.patentlyapple.com/patently-apple/2016/10/apple-sues-mobile-star-for-selling-counterfeit-power-adapters-and-charging-cables-through-amazon.html (last visited October 18, 2017).

91.  Upon information and belief, Defendants either made, had made, or purchased Samsung Chargers that were counterfeit.

92.  Defendants have carefully and faithfully reproduced the Samsung Chargers to include dimension, materials, look, and function.  Moreover, the chargers' packaging appears authentic.  Indeed, because of the counterfeit chargers were indistinguishable from authentic chargers, Samsung itself was the first to identify them as counterfeit.  The authentic appearance of the packaging effectively prevented Plaintiff LuxClub from being able to discover any breach of contract by Defendants.

### 1.  Differences Between Authentic Samsung Chargers and Counterfeit Samsung Chargers

93.  Upon initial inspection of the counterfeit Chargers, they appear and function similar to authentic chargers.  However, the counterfeit Chargers are of inferior quality.

94.  Authentic Samsung Chargers are supposed to have three colored lights

and flash each color when plugged in.  The different color lights represent different statuses such as charging and fully charged.

95.   The counterfeit Samsung Chargers, purchased from Distributor, do not have three colors of lights.  Rather, they only have a single color when used and do not change during different charging statuses.

96.   The counterfeit Samsung Chargers sometimes get extremely hot when used.

97.   The counterfeit Samsung Chargers do not work consistently with charging and their functions are intermittent.

98.   After becoming aware of the lack of authenticity of the Samsung Chargers, LuxClub verified the chargers were counterfeit by comparing Distributor chargers to other chargers known to be authentic. Simple testing confirmed this to be so as all authentic Samsung Chargers feature three different colored indicator lights while the Distributor counterfeit chargers only have a single colored indicator light.

99.   There were many negative product reviews and complaints. Initially, LuxClub believed the complaints stemmed from a lack of customer knowledge in the proper operation of the Samsung Chargers or the customers' use of incompatible phones. In addition, LuxClub also received numerous customer complaints directly by email messages expressing dissatisfaction with the

functionality of the units or even questioning the authenticity of the items
purchased from DGL.

### 2. *Safety Issues with Counterfeit Samsung Chargers*

100.      LuxClub is unaware of what actual underlying components
Defendants' counterfeit Samsung Chargers have.

101.      According to the Samsung website, the Samsung Wireless Charging
Pad is Qi certified by the Wireless Power Consortium (WPC).
http://www.samsung.com/us/mobile/mobile-accessories/phones/wireless-
charging-pad-black-sapphire-ep-pg920ibugus/ (last visited October 18, 2017).

102.      This certifies the wireless charger does not induce voltages that can
potentially cause damage to the product. The only acceptable proof that a
wireless charger is compatible and safe is that the product can be found in the Qi
Certified Product Database; all products must match by brand name, product
name, and type number. In order to receive a certification from the WPC, the
manufacturer must provide an authentic product for testing; if the product is not
authentic, it likely has not been certified as safe by the WPC and will not appear
in the database.  https://www.wirelesspowerconsortium.com/products/ (last
visited October 18, 2017).

103.      Wireless chargers generate strong magnetic fields. When the field is
too strong it can induce voltages that damage mobile phones and other related

29

devices.  https://www.wirelesspowerconsortium.com/products/ (last visited

Jul. 18, 2017).

104.      Importantly, the Samsung Chargers come with a warning –

> ⚠️ **WARNING:** This product can expose you to chemicals
> including one or more listed chemicals which are known to
> the State of California to cause cancer or birth defects or
> other reproductive harm. For more information, go to
> www.P65Warnings.ca.gov

https://www.newegg.com/Product/Product.aspx?Item=0S8-0001-010A2 (last

visited October 18, 2017).

### 3. *Samsung's Outside Counsel Currently has Samsung Counterfeit Chargers Purchased from Luxclub*

105.      Samsung's outside legal counsel currently has the counterfeit

Samsung Chargers sold to LuxClub by Distributor.  An unbroken chain links

these four entities.

106.      That is, the Distributor sent the Samsung Chargers directly to

LuxClub.

107.      LuxClub sent the Samsung Chargers directly to Amazon.

108.      Amazon shipped the Samsung Chargers to Samsung's outside legal

counsel.

109.      Finally, Samsung's outside legal counsel currently possesses the

counterfeit Chargers.

## X. DISTRIBUTORS BREACH OF CONTRACT

110.     The Purchase Orders are valid, enforceable contracts between LuxClub and Distributor. LuxClub performed under the contracts by paying Distributor for what Distributor represented were authentic Samsung Chargers.

111.     Distributor breached the Purchase Orders by selling LuxClub counterfeit Samsung Chargers.

112.     Distributor is liable to LuxClub for the price it paid for the Samsung Chargers.

## XI. EXTRAORDINARY CIRCUMSTANCES

113.     LuxClub's Amazon storefront IncaDove received an Amazon suspension that began with a rights owner complaint from Samsung Group, on November 16, 2016.  Mosseri Decl., ¶ 11.  Amazon notified LuxClub that there were authenticity problems with its Samsung Chargers that were purchased from Distributor.  Mosseri Decl., ¶ 12.

114.     LuxClub discovered that the Samsung complaint was submitted by Mr. Richard Nelson of Sideman & Bancroft LLP.   Mosseri Decl., ¶ 13.

115.     In order to settle the matter, Mr. Nelson required evidence concerning the purchase, processing, and selling of certain Samsung Chargers. Mosseri Decl., ¶ 14.

116.     Due to the holidays and remoteness of the evidence sought, Samsung and LuxClub resolved the matter after a month of cooperation.

Consequently, on February 5, 2017, Samsung withdrew its complaint; however, the account remained suspended despite the claim made by Amazon to the contrary.  Mosseri Decl., ¶ 15.

117.     Amazon had not reinstated LuxClub for nearly a year. Mosseri Decl., ¶ 16.

118.     However, when LuxClub became unsuspended, it no longer had access to favorable privileges such as the ability to sell Samsung and other luxury products on Amazon.com.  Mosseri Decl., ¶ 17.

**XII. CLAIMS**

<u>**FIRST CLAIM FOR RELIEF**</u>
<u>**WIRE FRAUD**</u>

119.     LuxClub re-alleges paragraphs 1  118  this Complaint as if set forth in full herein.

120.     Defendants voluntarily and intentionally devised or participated in a scheme to defraud LuxClub out of money.

121.     Defendants did so with the intent to defraud.

122.     It was reasonably foreseeable that interstate wire communications would be used.

123.     Interstate wire communications were in fact used.

<u>**SECOND CLAIM FOR RELIEF**</u>
<u>**CONSPIRACY**</u>

124.     LuxClub re-alleges paragraphs 1  118  of this Complaint as if set

forth in full herein.

125.     Defendants agreed to procure, manufacture, and/or sell counterfeit Samsung Chargers.

126.     Defendants actually procured, manufactured, and/or sold counterfeit Samsung Chargers.

## THIRD CLAIM FOR RELIEF
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)(18 U.S.C. § 1964)

127.     LuxClub re-alleges paragraphs 1 -126 of this Complaint as if set forth in full herein.

128.     Defendants engaged in wire fraud, which amounts to a "racketeering activity" pursuant to 18 U.S.C. § 1961(1).

129.     Defendants engaged in a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5).

130.     At all relevant times, LuxClub and Defendants are "persons" pursuant to 18 U.S.C. § 1961(3).

131.     At all relevant times, Defendants formed a group of individuals associated in fact, which is an "enterprise" pursuant to 18 U.S.C. § 1961(4).

132.     All of the mailings and the numerous telephone calls, e-mails and internet postings by Defendants were made in furtherance of their conspiracy. Therefore, all of these communications were made in violation of the mail and

wire fraud statutes.  LuxClub was defrauded by one or more of these mails and wires.

133.     Thus, LuxClub asserts claims against all Defendants for conspiring to violate 18 U.S.C. § 1962(c), which prohibits any person employed by or associated with an enterprise from participating in the affairs of the enterprise through a pattern of racketeering activity.

134.     This conspiracy to violate 18 U.S.C. § 1962(c) is a violation of 18 U.S.C. § 1962(d).

## FOURTH CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY

135.     LuxClub re-alleges paragraphs 1 118 of this Complaint as if set forth in full herein.

136.     Distributor is a merchant as defined by New York's Uniform Commercial Code.

137.     Defendants represented that it sold authentic Samsung Chargers and would enter into a contract with LuxClub for the sale of those chargers.

138.     LuxClub sought to purchase only authentic Samsung Chargers from Defendants.

139.     LuxClub purchased Samsung Chargers from Defendants that by all accounts appeared to be authentic chargers.

140.     Defendants sold counterfeit Samsung Chargers to LuxClub instead.

141.    At the time sale, the counterfeit goods that Defendant sold were not of the same quality, description, and fitness when compared to authentic Samsung Chargers.

142.    LuxClub has suffered direct and consequential damages due to Defendants' sale of counterfeit chargers.

## FIFTH CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY

143.    LuxClub re-alleges paragraphs 1  118 of this Complaint as if set forth in full herein.

144.    Distributor is a merchant as defined by New York's Uniform Commercial Code.

145.    LuxClub purchased Samsung Chargers from Defendants that Defendants expressed were authentic.

146.    Defendants' emails indicated that it was selling authentic Samsung Chargers.

147.    Defendants' conversation with LuxClub indicated that LuxClub was purchasing authentic Samsung Chargers.

148.    LuxClub was only interested in purchasing authentic Samsung Chargers.

149.    LuxClub's invoice states that the sale was made for Samsung Chargers.

150.     Defendants sold counterfeit Samsung Chargers to LuxClub instead.

151.     LuxClub would have not purchased the Samsung Chargers from Defendants if they were counterfeit.

152.     LuxClub has suffered direct and consequential damages due to Defendants' sale of counterfeit chargers.

### SIXTH CLAIM FOR RELIEF
### BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A
### PARTICULAR PURPOSE N.Y. U.C.C. LAW § 2-314

153.     LuxClub re-alleges paragraphs 1  118 of this Complaint as if set forth in full herein.

154.     Distributor is a merchant as defined by New York's Uniform Commercial Code.

155.     Distributor guaranteed that the Samsung Chargers were fit to be sold as authentic Samsung Chargers.

156.     Further, distributor guaranteed that the authentic Samsung Chargers were fit to be resold.

157.     LuxClub informed Defendants' that it was to sell the Samsung Chargers on Amazon.com.

158.     Defendants knew that LuxClub would sell them on Amazon.com.

159.     Defendants knew that LuxClub could not sell counterfeit goods on Amazon.com.

160.     Distributor breached the Uniform Commercial Code implied warranty of merchantability because it sold goods that are not fit for the ordinary purposes for which such goods are used. The counterfeit chargers that Defendant sold LuxClub were not suitable to be sold on Amazon.com.

161.     LuxClub detrimentally relied on Defendants' selling its authentic Samsung Chargers.

162.     LuxClub has been damaged by Defendant sale of counterfeit goods.

## SEVENTH CLAIM FOR RELIEF
## BREACH OF THE WARRANTY OF NON-INFRINGEMENT UNDER
## N.Y. U.C.C. LAW § 2-312

163.     LuxClub re-alleges paragraphs 1  118 of this Complaint as if set forth in full herein.

164.     Distributor is a merchant as defined by New York's Uniform Commercial Code.  Distributor regularly deals in electronic goods such as Samsung Chargers.  The Samsung Chargers were part of the distributor's normal stock and they were sold in the normal course of business.  As such, LuxClub did not furnish any specifications for the stock Samsung Chargers to distributor.

165.     Distributor warranted that the Samsung Chargers were to be delivered free of the rightful claim of any third person by way of infringement or the like.

166.     Distributor had a duty to see that no claim of infringement of a

37

trademark by a third party.

167.     Distributor breached that duty by selling counterfeit Samsung

Chargers to LuxClub.

### EIGHTH CLAIM FOR RELIEF
### NEW YORK DECEPTIVE BUSINESS PRACTICES
### NEW YORK GENERAL BUSINESS LAW § 349

168.     LuxClub re-alleges paragraphs 1  118 of this Complaint as if set

forth in full herein.

169.     Defendants, independently and in conspiracy with one another,

offered for sale, sold, and or distributed low-quality counterfeit Samsung

Chargers unlawfully bearing Samsung's trademarks.

170.     Defendants' conduct is deceptive to ordinary members of the public

and harmful to the public interest.  Ordinary members of the public that

purchased Defendants counterfeit Samsung Chargers from LuxClub through

Amazon.com were deceived in that they believed they purchased authentic

Samsung Chargers.  Defendant sale of counterfeit Samsung Chargers pose a

potential safety concern and are not certified to the same standards as an

authentic Samsung charger.

171.     As a direct and proximate result of Defendants' deceptive conduct,

LuxClub has suffered irreparable harm to its business.

172.     LuxClub has no adequate remedy at law that will compensate for

the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

## NINTH CLAIM FOR RELIEF
## COMMON LAW UNFAIR COMPETITION

173.     LuxClub re-alleges paragraphs 1  118 of this Complaint as if set forth in full herein.

174.     In violation of the common law of the State of New York and elsewhere, Defendants, independently and in conspiracy with one another, have unfairly competed with LuxClub by selling counterfeit Samsung Chargers.

175.     As a direct and proximate result of Defendants' unfair competition, LuxClub have suffered irreparable harm to its business and its reputation in the Amazon.com marketplace. Unless Defendants' conduct is restrained, LuxClub will continue to be irreparably harmed.

176.     LuxClub has no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

177.     As a direct and proximate result of Defendants' unfair competition, LuxClub has suffered damages.

**PRAYER FOR RELIEF**

WHEREFORE, LuxClub prays that this Court

- enter judgment in favor of LuxClub and against Defendants for all counts;

- find and enter and order that Defendants' conduct amounts to an exceptional case and award LuxClub its costs and attorney's fees;

- award LuxClub damages for Defendants' breach of contract;

- award LuxClub actual, consequential, and punitive damages caused by the Defendants' intentional and tortious misconduct against LuxClub;

- award costs and expenses to LuxClub;

- award LuxClub prejudgment interest and costs;

- have this case be tried before a jury; and

- award LuxClub such other and further relief as the Court deems just and proper, premises considered.


-----------*Signature Page Follows*-----------

## JURY TRIAL DEMANDED

LuxClub hereby demands a trial by jury under Federal Rule of Civil

Procedure 39 for all issues triable by jury.

Respectfully submitted, this July 18, 2018.

By:    /s/ CJ Rosenbaum
       CJ Rosenbaum (CSR 7529)
       New York State Bar No. XXXX
       E-mail:  CJ@AmazonSellersLawyer.com

**Rosenbaum Famularo, P.C.**
**100 West Park Avenue, Ste. 310**
**Long Beach, New York 11561**


212.256.1109

                              Jeffrey T. Breloski
                              Georgia Bar No. 858291
                              *Pro Hac Vice to be applied for*
                              E-mail:  jbreloski@ATLawip.com

ATLawip LLC
2065 Compton Way
Johns Creek, Georgia 30022
678.667.3491
770.680.2461 (fax)

                              *Attorneys for Plaintiff*